**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

GILBERT RIVERA,                              )
                                             )
    Plaintiff,                           )
                                             )
    v.                                   )          Case No. 2:23-CV-123-PPS
                                             )
U.S. STEEL CORPORATION,                      )
                                             )
    Defendant.                           )

**<u>OPINION AND ORDER</u>**

Pro se Plaintiff Gilbert Rivera is a former employee of U.S. Steel Corporation (having resigned on November 13, 2025), who claims the company discriminated against him due to his race (he is Hispanic) and national origin, and retaliated against him for filing a civil rights complaint through his union. Rivera also alleges U.S. Steel subjected him to a hostile work environment. U.S. Steel seeks summary judgment on all of Rivera's claims. Because there is simply no evidence from which a reasonable juror could conclude that U.S. Steel discriminated against Rivera because of his race, or retaliated against him, or subjected him to a hostile environment, U.S. Steel's motion for summary judgment will be granted.

**Evidentiary Issues**

I'll start with the evidentiary issues raised by the briefing. With all due respect to the parties, the record in this case is a bit of a mess. Part of the problem is that Mr.

Rivera has been through three attorneys, and is now handling the matter pro se. [DE 30, 40, 72.]  After U.S. Steel filed its motion for summary judgment, Rivera filed a brief in opposition [DE 84] and an appendix of exhibits comprising 559 pages of exhibits [DE 83].  U.S. Steel told me at an in person hearing that many of these exhibits were either unauthenticated or not previously produced during discovery.  In an effort to clear up the record, I allowed Rivera to file another response, and I warned him to specifically identify what he was relying on in the record and not just dump hundreds of pages on the court and opposing counsel and expect them to sort it out.  This time Rivera filed an appendix of evidence with 557 pages of exhibits (a mere 2 pages less than the previous time). [DE 97.]

As identified in U.S. Steel's reply to Rivera's statement of material facts [DE 98], many of these documents were never produced during discovery, several are not authenticated, and many of Rivera's responses contain both admissions and confusingly denials in the same paragraph.  *See, e.g.,* DE 96 at 9.  This sort of equivocal response happens a lot.  To add to the confusion in this case, some of the exhibits submitted by Rivera seem to be unidentified text messages—the content of which makes no sense because no context was provided [*see* DE 97-9]—and some are transcripts.  The transcripts appear to be made from conversations between Rivera and certain co-workers, in addition to union meetings Rivera attended—it seems Rivera recorded these conversations and meetings and then had a court reporter transcribe these events. [*See* DE 97-10, Exs. J-1 through J-9, which comprise more than 300 pages of exhibits.]

2

U.S. Steel did not formerly file a motion to strike.  This was the correct tact by U.S. Steel because L.R. 56-1(f) provides that "[d]isputes about the admissibility or materiality of evidence must be raised in the parties' briefs.  A separate motion to strike must not be filed."  Instead, U.S. Steel included in its reply to Plaintiff's statement of additional material facts argument as to why certain categories of Rivera's exhibits should be excluded from consideration during this motion for summary judgment. [DE 98 at 2-5.]

I agree that the documents attached to Rivera's Appendix that were never produced by Rivera's previous attorneys or himself during discovery should not be considered during this motion for summary judgment.  Federal Rule of Civil Procedure Rule 26(a)(1)(a)(ii) requires a party to provide to the other party a copy "of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses . . . ."  Rule 26 also requires a party to supplement or amend its disclosures and discovery responses if it learns that the information disclosed or the response is "incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1).  To ensure compliance with these discovery requirements, Rule 37 provides that if a party fails to disclose information required by Rule 26(a) or (e), it is prohibited from using that information unless the failure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1).

The Seventh Circuit has stated that "the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its violation of Rule 26(a) was either justified or harmless." *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998). In this case, Rivera has not showed that the failure to turn over these documents was substantially justified or harmless. Indeed, it's hardly fair that U.S. Steel had no opportunity to question Rivera about the text messages, transcribed recordings, and other documents not produced before, or an opportunity to designate contradictory evidence for these summary judgment proceedings. "Where a party failed to produce a document during the discovery process, it is proper for a court to refuse to consider it on motion for summary judgment." *Episcopo v. Gen. Motors Corp.*, No. 02 C 8675, 2004 WL 628243, at *7 (N.D. Ill. Mar. 29, 2004); *see also Harris v. Regal-Beloit America, Inc.*, No. 1:21-CV-74-HAM, 2023 WL 6307754, at *2-3 (N.D. Ind. Sept. 27, 2023) (striking an exhibit from the summary judgment record that was not previously disclosed); *Shepard v. Frontier Commc'ns Servs., Inc.*, 92 F.Supp.2d 279, 285-86 (S.D.N.Y. 2000) (when considering a motion for summary judgment, the Court will not rely on a document that was responsive to discovery requests, but never produced, and only first disclosed as an exhibit supporting the motion).

The unproduced portions of the documents attached to Rivera's Appendix, which will not be considered during this motion for summary judgment, are as follows: Ex. B-5 (ECF 97-2 at 9-10); Ex. B-6 (ECF 97-2 at 11); Ex. B-7 (ECF 97-2 at 12); Ex. C-3 (ECF 97-3 at 4); Ex. C-4 (ECF 97-3 at 5); Ex. E-1 (ECF 97-5 at 1-46); Ex. E-2 (ECF 97-5 at 47-99);

Ex. E-3 (ECF 97-5 at 100-142); Ex. G-1 (ECF 97-7 at 1-5); Ex. H-1 (ECF 97-8 at 1); Ex. H-6 (ECF 97-8 at 9-10); Ex. H-7 (ECF 97-8 at 11-12); Ex. H-8 (ECF 97-8 at 13); Ex. I-3 (ECF 97-9 at 4); Ex. I-4 (ECF 97-9 at 5-13); Ex. J-1 ECF 97-10 at 1, 101-143); Ex. J-2 (ECF 97-10 at 144-236); Ex. J-3 (ECF 97-10 at 237-273); Ex. J-4 (ECF 97-10 at 274-296); Ex. J-5 (ECF 97-10 at 297-310); Ex. J-6 (ECF 97-10 at 2-20); Ex. J-8 (ECF 97-10 at 70-99); and Ex. J-9 (ECF 97-10 at 100-107).

There is one final note I'll make relating, in particular, to the transcripts of the recorded conversations and union meetings: on top of the failure to produce and authenticate these documents, they also constitute inadmissible hearsay. *See Gulf Ins. v. Kingman*, No. 94-3437, 61 F.3d 905 (Table), at *3 (7th Cir. July 20, 1995) (refusing to consider transcript of an interview during summary judgment proceedings because it was hearsay). So I will disregard them for this reason as well.

U.S. Steel's reply raises a host of other criticisms of Rivera's statement of facts. [DE 98 at 4-73.] I won't address each of the issues chapter and verse. Instead, I will simply note what my colleague previously said: "[I]t is the function of a court, with or without a motion to strike, to review carefully both statements of material facts and statements of genuine issues and the headings contained therein and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement." *Mayes v. City of Hammond*, 442 F. Supp.2d 587, 596 (N.D. Ind. 2006). I assure the parties that the Court

has made every reasonable effort to adhere to that approach in my evaluation of the motion presently before me.

**Factual Background**

U.S. Steel hired Plaintiff, Gilbert Rivera, on March 12, 2018, as a Maintenance Technician Electrician (MTE) at its Gary Works facility. [Gilbert Rivera Dep., DE 80-1 at 16-17.[1]]  After a few years on the job, Rivera became a full rate MTE. [*Id.* at 18.]  As an MTE, Rivera's job duties included responding to electrical breakdowns, making electrical repairs, and electrical maintenance for U.S. Steel's lines within his assigned area of the facility. [*Id.* at 20-21.]

The Gary Works facility has three subdivisions for what they call the "Hot Roll Division": (1) the Hot Strip Mill; (2) the Pickle Line, and (3) West Environmental. [Mark Lash Dep., DE 80-2 at 23.]  Initially, Rivera was assigned to the Hot Strip Mill within the Hot Roll Division. [*Id.* at 23, 62, 67-69.]  The Hot Strip Mill is in turn subdivided into three areas: (1) the Roughing Mill; (2) the Finishing Mill; and (3) Coilers. [DE 80-1 at 18-19; DE 80-2 at 24, 62-65, 67-69.]

Let's begin by introducing the cast of characters: A person by the name of Rob Lemmons was responsible for supervising MTEs in the Hot Strip Mill from January 20, 1997, up until the present. [DE 80-3 at ¶¶ 1-5.]  U.S. Steel assigned Rivera to the Roughing Mill from March 2020 through October 18, 2020. (DE 80-1 at 16-18, 19-25).

---

[1] Citations to deposition pages are the black numbers found at the top right of the deposition page.

Julian Lopez was Rivera's direct supervisor while he worked in the Roughing Mill [*Id.* at 18] but Rivera also testified that Bob Rogers was his first supervisor in the Roughing Mill, and then his supervisor changed to Julian Lopez [*Id.* at 17].  On October 18, 2020, U.S. Steel assigned Rivera to the Coilers area within the Hot Strip Mill. [*Id.* at 35-36.] Wes Burmeister was Rivera's direct supervisor while he worked in the Coilers. [*Id.* at 21.]

U.S. Steel's bargaining unit employees are represented by the United Steelworkers Union.  [*Id.* at 26-28, Exhibit A-2 (DE 80-1 at 218), Basic Labor Agreement ("BLA") at 1.]  Rivera was a bargaining unit employee represented by the Union for the duration of his employment at U.S. Steel. [DE 80-1 at 26-28; DE 80-3 at ¶¶ 1-4.]  U.S. Steel and the Union have negotiated and agreed to a collective bargaining agreement known as the Basic Labor Agreement ("BLA"), which governs several terms and conditions of employment for bargaining unit employees. [DE 80-1 at 26-28; see generally BLA; DE 80-3 at ¶¶ 1-4).  Under the BLA, MTEs have a contractual right to select between the Hot Strip Mill, Pickle Line, and West Environmental based on seniority. [DE 80-2 at 24-26, 62-65, 67-69.]  However, MTEs have no contractual right under the BLA to a particular assignment *within* the Hot Strip Mill. [*Id.* at 24-26, 62-65, 67-69.]

Pursuant to the BLA, all MTEs receive the same rate of pay regardless of their assignment within the Hot Strip Mill. [DE 80-1 at 30-31.]  The BLA provides MTEs a right to a minimum of 56 hours per week if certain conditions are met. [*Id.* at 49-50; BLA

at 122, Sec. 5.] However, the right to a minimum of 56 hours per week for MTEs does *not* apply during any week U.S. Steel does not utilize contractors to perform bargaining unit maintenance and repair or MTE like work inside the Gary Works facility. [DE 80-1 at 50-51, 77-48; BLA at 126, App. B-8.] Additionally, the Overtime Equalization Agreement and its addenda (collectively, the "OT Agreement") within the BLA dictate the contractual overtime rights of U.S. Steel's bargaining unit employees. [DE 80-1 at 40-42, 44-45; DE 80-2 at 32-34.] The OT Agreement contains a formal procedure for the Union to address alleged violations, including any concerns about U.S. Steel's posting and maintaining Overtime Equalization Sheets. [DE 80-1 at 45; DE 80-2 at 37-38.]

The Union filed a civil rights grievance on behalf of the MTEs in the Roughing Mill at Rivera's request on June 26, 2020 (the "Civil Rights Complaint"). [DE 80-1 at 55; DE 80-3 at ¶¶ 6-7; Bauer Dec. Exhibit C-1, Civil Rights Complaint; DE 96 at ¶ 81.] The Civil Rights Complaint claimed management was creating a racially hostile work environment for minorities based on several things, including verbal harassment, inconsistent work assignments and training, poorer work conditions, segregation, and limited access to tools. Rivera and the other MTEs in the Roughing Mill met with the Union and members of U.S. Steel management to address the concerns raised in the Civil Rights Complaint on July 9, 2020. [DE 80-3 at ¶ 8.] For its part, U.S. Steel believed the meeting had resolved the concerns raised in the Civil Rights Complaint. [*Id.* at ¶¶ 9-10.] Rivera says it did not.

8

Rivera claims the MTEs were physically segregated based on race within the Hot Strip Mill. [DE 80 at ¶ 28.]  U.S. Steel believes Rivera conceded that any alleged segregation ended once he moved to the Coilers unit on October 18, 2020; however, Rivera contends "the same underlying discriminatory and retaliatory treatment continued after the move," but U.S. Steel then claims the evidence Rivera relies on for the alleged discrimination when he was with the Coilers is all inadmissible. [DE 98 at 16-17.]  Rivera's own deposition testimony resolves the issue.  Rivera admitted in his deposition that when he was referring to the time he was segregated, it was when he was assigned to the Hot Strip Mill. [DE 80-1 at 58, 60, 98-99, 125-26, 155-156, 190-91, 197-98.]  Indeed, when asked during his deposition, "[y]our claim is that once you moved to the coilers, it was no longer the case, there was no longer segregation, correct?" and he answered "yes." [*Id.* at 155-56.]

Although Rivera claims minorities were segregated in the Roughing Mill, the racial makeup of the MTEs who were assigned to the Roughing Mill suggests the contrary: Ambler, B. (Caucasian); Clardy, J. (Black/African-American); Facen, A. (Black/African-American); Harris, O. (Black/African-American); Noonan, M. (Caucasian); Peterson, B. (Caucasian); Quintero, M. (Hispanic); Rivera, G. (Hispanic); Sams, D. (Black/African-American); Thomas, T. (Caucasian). [DE 80-1 at 103:13-105:5; DE 80-3 at ¶ 10.]  Generally, U.S. Steel would assign the Full Rate MTEs with the least seniority to the Roughing Mill. [DE 80-1 at 59-60, 108, 189-90; DE 80-3 at ¶ 11.]  Rivera

admitted that he does not know which U.S. Steel employee (or employees) made the decisions about MTE assignments within the Hot Strip Mill. [DE 80-1 at 60, 128-130.]

In his complaint, Rivera alleges that "Hispanic and non-white employees work in an area that is in disrepair and is not in close proximity to a restroom" and they "are forced to use the restroom in a hole in the ground." [DE 1 at 2.]  While U.S. Steel claims it permits the MTEs in the Hot Strip Mill to use any of the different rest areas (commonly known by the employees as "shanties") regardless of whether they work in the Roughing Mill, the Coilers, or the Finishing Mill [DE 80 at 5], Rivera testified during his deposition that sometimes he would knock on the door of a shanty, and unidentified people would not let him in. [DE 80-1 at 101-03, 107-09.] Rivera testified that all of the people who worked in the Roughing Mill used a makeshift bathroom, with a hole in the ground, up until July 2020. [*Id.* at 110-12.]  Rivera concedes that there was a restroom in the finishing mill which was locked for some time, but then when it changed from a key to combination access in July 2020, he started using that restroom. [*Id.* at 110, 112-13.]

Rivera also alleges that he did not receive the same training opportunities as other employees.  U.S. Steel provides all MTEs with approximately two (2) years of training, when they are first hired on as MTEs (they call them "Learners.") [DE 80-1 at 16-18; DE 80-3 at ¶ 13.]  According to the declaration of Kenneth A. Bauer, Labor Relations Manager for U.S. Steel, decisions related to on-the-job training opportunities depend on which area of the Hot Strip Mill the repair or replacement is taking place, the difficulty of the repair task, scheduled coverage of other tasks and shifts, the most

10

efficient and expeditious way to ensure minimum downtime, and other business considerations. [DE 80-3 at ¶¶ 12, 14.]  Rivera alleges Ian Cunningham, Keith Munk, Matt Ripperdan, and Mike Lavezich received more favorable treatment than him because they were "built up," received preferential work projects, and received more hands-on training while Rivera was doing housekeeping, but Rivera could not recall specific examples or dates of these alleged incidents. [DE 80-1 at 60-61.]  Rivera was not provided training in a PLC course at the end of 2019, but he does not know which MTEs received that training. [*Id.* at 113-117.] Additionally, the PLC training related to work in the Finishing Mill and not in the Roughing Mill where Rivera actually worked. *Id.*

Rivera admitted he had no personal knowledge about who received training, and Rivera offered no evidence that he was entitled to the training or that the lack of PLC training at that time adversely impacted his pay or job advancement opportunities. *Id.* Rivera claims when he asked Julian Lopez and Mr. Rogers if he could get that training he was told "only the smart guys get to go down there." [*Id.* at 114.]

During his deposition, Rivera complained he was not called in to work around Memorial Day of 2020, when MTEs working a shift were assigned to respond to a conveyor flood and drive issue with a blown cable.  Rivera was not working the shift at the time of the maintenance issue. [DE 80-1 at 136-143.]  Rivera does not know who made the decision to use the other MTEs to respond to the conveyor flood and drive issue. [*Id.* at 138-140, 143, 180.]  By the time Rivera reported for his shift, the other MTEs had already completed work fixing the conveyor flood and drive issues. [*Id.* at 141.]

11

In May of 2020, Lemmons asked Rivera if he wanted to learn about installing drives. [*Id.* at 183-84.]  Rivera indicated he would like to learn about the install, but then Lemmons never followed up. *Id.* Rivera does not know who ultimately worked on those drives or who decided which MTEs received the training. *Id.* In June of 2020, Rivera and other Roughing Mill MTEs requested to be part of a project in the Finishing Mill related to equipment also in the Roughing Mill, but USS did not follow up with them and let them assist. [*Id.* at 159-162.]  Rivera does not know who made the decision not to have the Roughing Mill MTEs assist. [*Id.* at 160, 162.]

Among Rivera's other claims, he also alleges that U.S. Steel created a hostile work environment. [DE 1 at 3.]  Sometime in February 2020, Rivera overheard someone in a nearby room (Rivera thought the voice he recognized was Bob Rogers) say that U.S. Steel should hire Mexicans if it wanted cheap labor. [DE 80-1 at 117-21.]  In addition, on that same occasion, Jim Newton (an in-house contractor) referred to Rivera as "Roberto." [*Id.* at 121-22.] Rivera never reported this to U.S. Steel. [*Id.* at 118-119, 121-23.]  Newton also allegedly said "ariba, ariba" to Rivera during the same time in February 2020, but Rivera never brought it to U.S. Steel's attention or included it in a Civil Rights Complaint with his Union. [*Id.* at 118-20.]

U.S. Steel assigned Rivera to the Coilers on October 18, 2020. [*Id.* at 33, 54; DE 80-2 at 51-52, 62, 67-69.]  The BLA does not provide an employee with a contractual right to a particular assignment within the Hot Strip Mill. [DE 80-2 at 24-26, 36, 62-65, 67-69.]  Mark Lash, Rivera's Local Union President, explained to Rivera that Rivera was moved

to the Coilers rather than another MTE, Ian Cunningham, because Cunningham had seniority over him. [DE 80-1 at 33-39, 54; DE 80-2 at 62-65, 67-69.] Although the process upset him, Rivera admits he has no preference between his former assignment in the Roughing Mill and his assignment with the Coilers. [DE 80-1 at 150, 205.] In fact at the time of his deposition, he testified that he liked working in the Coilers. [*Id.* at 205.] Rivera was upset at the time of his move to the Coilers because he believed U.S. Steel had failed to follow proper procedures under the BLA by selecting him for that assignment. [*Id.* at 150-52.]

Rivera also claims he was discriminated against when he was denied overtime opportunities. [DE 1 at 3.] U.S. Steel contends Rivera's beliefs about missed overtime opportunities are based on his review of inaccurate Overtime Equalization Sheets and his pay records. [DE 80-1 at 45-47, 63-65, 71-72, 145-46, 148, 162-63, 207-08.] At some point, Rivera noticed he was not listed on an Overtime Equalization Sheet provided to him by a coworker and not management, but he is not certain who would have taken him off the list. [*Id.* at 143-45.] In a separate Overtime Equalization Sheet provided to Rivera by Rivera's former Union Griever William P.W. Fulton, Rivera was listed as having refused almost 500 hours in one week. [*Id.* at 144.] Rivera stated he never refused 458 hours, and everyone seems to agree that the second Overtime Equalization Sheet could not be accurate because it was not possible for him or other employees to have turned down that many hours. [*Id*. at 144-45, 228-232.]

When asked during his deposition what supported his claim of lost overtime opportunities, Rivera pointed to the following: 1) a text message with Burmeister denying him overtime once; and 2) a recording of Burmeister stating a particular week was not a contractor week and MTEs were limited to 40 hours. [*Id.* at 63-67, 72, 162-63, 194-96.]  When Rivera moved to the Coilers area, Burmeister stated the MTEs should only work their scheduled hours and not overtime because it was not a "contractor week." [*Id.* at 79-80.] As noted above, under the applicable labor agreement, MTEs had a right to a minimum of 56 hours per week but that minimum doesn't apply during any week that U.S. Steel does not utilize contractors to perform work inside the Gary Works facility. [BLA at 126, App. B-8; DE 80-1 at 50-51, 77-78.] Consistent with this policy, Rivera admitted he is only entitled to 40 hours per week under the BLA if it is a week without contract work. [*Id.* at 194-95.]

Rivera does not know who made the decision related to his alleged reduction in overtime hours. [DE 80-1 at 63-65, 143-44, 148-49.] Rivera and the other minority MTEs in the Coilers received roughly the same scheduled hours his first week after his assignment into that section of the Hot Strip Mill. [*Id.* at 196-98.] Although he makes sweeping generalizations, Rivera cannot point to any specific dates where U.S. Steel denied him available overtime when he requested it. [*Id.* at 65-67, 79-80, 149, 207-08, 238, 245.]  In addition, Rivera admits he does not know how many overtime hours his coworkers have received. [*Id.* at 79, 145-46, 207-08, 238-254.]

14

Rivera made a formal complaint about his overtime opportunities to the Union's District leadership. [*Id.* at 74-75.] In January 2021, Rivera met with Lemmons, Burmeister, the Union's Civil Rights Representative Sharntal Smith, and Fulton about Rivera's overtime hours. [*Id.* at 76-77, 132-33.] The Union never filed a grievance with U.S. Steel about Rivera's overtime hours. [*Id.* at 244-45, 253.] Even though the MTE schedules state that MTEs should see Lemmons or Lopez for overtime opportunities, Rivera never went to them about overtime. [*Id.* at 198:8-11, 199:1-5.]

### Standard of Review

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citation omitted). In other words, a party opposing summary judgment may not rely on allegations or denials in his pleading, but rather must "marshal and present the court with the evidence [he] contends will prove [his] case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). On a motion for summary judgment, all facts and reasonable inferences are construed in a light most favorable to the non-moving party. *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025).

### Discussion

Essentially, Rivera's complaint brings three claims: discrimination, retaliation and hostile work environment. [DE 1.]  I'll address each in turn below.

## I.    Discrimination Claims

Title VII makes it unlawful for an employer to refuse to hire or to discharge any individual, or to otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of that individual's race, color, religion, sex, or national origin. *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 628 (7th Cir. 2018); 42 U.S.C. § 2000e-2(a)(1).  Section 1981 also prohibits racial discrimination and "provides a federal remedy against racial discrimination in private employment." *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 789 (7th Cir. 2019).

"The legal analysis for discrimination claims under Title VII and § 1981 is largely identical." *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022).  To survive summary judgment on these discrimination claims, Rivera must present evidence that "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  The only caveat to the general overlap between these two statutes concerns causation.  Under Title VII, the plaintiff must show race was a "motivating factor in the defendant's challenged employment decision." *Lewis*, 36 F.4th at 759 (quoting *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 337 (2020)).  Section 1981 requires a little more: "a

16

plaintiff bears the burden of showing that race was a but-for cause of [his] injury."
*Comcast Corp.*, 589 U.S. at 333.

U.S. Steel largely evaluated the discrimination claims using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, a plaintiff must make a *prima facie* case of discrimination by showing: (1) they are a member of a protected class; (2) they performed reasonably on the job in accordance with their employer's legitimate expectations; (3) they were subjected to an adverse employment action despite their reasonable performance; and (4) similarly situated employees outside of the protected class were treated more favorably by the employer. *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). If the plaintiff makes out a *prima facie* case, the defendant must articulate a legitimate, nondiscriminatory reason for the adverse action, at which point the burden shifts back to the plaintiff to present evidence that the employer's explanation is pretextual. *Id.*

But the *McDonnell Douglas* shifting burden test is not the only way to analyze a discrimination case. As the Seventh Circuit explained in *Ortiz*, courts may take a holistic approach and simply view all of the evidence, direct and circumstantial, place it into a pile, and ask whether a reasonable juror could conclude based on all the evidence that discrimination occurred. 834 F.3d at 765. In a recent concurrence, Justice Thomas suggested the same thing. *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 313–19 (2025) (Thomas, J., concurring).

17

Rivera insists "the Court must evaluate the evidence as a whole, not through artificial boxes or by asking whether each item alone proves the case." [DE 95 at 1.] Rivera maintains the holistic approach set forth in *Ortiz* is the better route for analysis, and that his claims would survive under that type of examination. However, the burden-shifting framework set forth in *McDonnell Douglas* can still be used as a means to "organize, present, and assess evidence in discrimination cases." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).

It is essential to recognize that under *either* the holistic approach or the burden-shifting framework, Rivera must present specific, admissible evidence establishing each element of his claims, including but not limited to evidence of an adverse employment action and discriminatory and retaliatory causation. *See, e.g., Thompson v. Trs. of Ind. Univ.*, No. 1:23-cv-2094-TWP-MKK, 2026 WL 1064700, at *13 (S.D. Ind. Apr. 20, 2026) (granting summary judgment for employer because plaintiff failed to present evidence of any discriminatory motive so under *Ortiz*, "a jury could not find that the [employer's] actions were based on [the plaintiff's protected characteristics].").

Whatever route of analysis is implemented, the result here is the same—Rivera has failed to show that he was discriminated against due to his race or national origin, or that he was retaliated against after he filed a Civil Rights Complaint.

Recall that Rivera worked as an MTE in the Hot Strip Mill within the Hot Roll Division at the Gary Works facility. The Hot Strip Mill is further divided into the Roughing Mill, the Finishing Mill, and the Coilers. His first assignment was to the

18

Roughing Mill, where Rivera claims the segregation occurred.  But his segregation claims fail at the outset because U.S. Steel has showed that there was racially diverse workforce among the 10 MTEs assigned to the Roughing Mill when Rivera's Union filed the Civil Rights Complaint on June 26, 2020. [DE 80-3 at ¶ 10.]  Four of the ten employees working as MTE's assigned to the Roughing Mill were Caucasian.  *Id*.  The other MTE's in the Hot Strip Mill received the same rate of pay regardless of their assignment within the Hot Strip Mill. [DE 80-1 at 30.]  To refer back to the burden-shifting approach for a minute, Rivera has not established a prima facie case of discrimination.  Even assuming for the moment that he has, U.S. Steel has established that it generally assigns Full Rate MTEs with the least seniority to the Roughing Mill [DE 80 at ¶ 30] and Rivera has not submitted any evidence showing the assignment of MTEs within the Hot Strip Mill is based on any discriminatory motive.  In fact, Rivera concedes he does not know who made the decisions related to MTE assignments [DE 80 at ¶ 31], so he has not pointed to a particular decisionmaker who allegedly had a racially-backed motive when making employment assignments.

To the extent Rivera points to training opportunities and lack of advancement, Rivera has not established this constitutes an "adverse employment action."  It is well settled that not everything that makes an employee unhappy is an actionable adverse employment action.  Federal law "does not protect against petty slights, minor annoyances, and bad manners," *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016), and "is not intended to reach every bigoted act or gesture that a worker might encounter in the

19

workplace." *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 406 (7th Cir. 2010). Rather, "[a]n adverse employment action is one that significantly alters the terms and conditions of the employee's job." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004).  For example, adverse employment actions include "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce further career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Reives*, 29 F.4th at 894.

As recounted in the fact section, Rivera points to a specific PLC course in 2019 that he did not get to participate in, he was not given the opportunity to gain hands-on experience during a conveyor flood and drive issue with a blown cable around Memorial Day of 2020, he was denied an opportunity to learn about the installation of drives in May 2020, and he never heard back from U.S. Steel after he requested an opportunity to be part of a project in the Finishing Mill in June 2020. [DE 80 at ¶¶ 39-51.]  These all strike me as trifles.

First, Rivera concedes that he doesn't know who ultimately worked on these projects or who assigned the MTEs to these training opportunities and projects. [DE 80 at ¶ 45, 49, 51.] And importantly, Rivera has not established that the lost training opportunities were tied to compensation, promotion, or job requirements, and he offered no evidence of similarly situated workers outside of his race or national origin

receiving better pay or job advancements due to the lost training opportunities. *See Johnson v. Siemens Bldg. Techs., Inc.*, 273 F. App'x 543, 547-49 (7th Cir. 2009) (affirming finding that denial of training was not an adverse employment action because it was not tied to an increase in compensation, was related to work in a different unit of the company, and was not necessary for plaintiff's position). While Rivera claims that Ian Cunningham, Keith Munk, Matt Ripperdan, and Mike Lavezich received more hands-on training than he did [DE 80 at ¶ 40], he offers no evidence that they received better pay or job advancements due to the training. *See, e.g., Shrock v. Drug Plastics & Glass Co., Inc.*, No. 4:17-cv-53-TLS, 2022 WL 1801144, at *8 (N.D. Ind. June 2, 2022). What's more, there is simply no evidence that these training decisions were made on the basis of race. *See Smithson v. Miller*, No. 1:20-cv-3021-JRS-MJD, 2022 WL 4098583, at *2 (S.D. Ind. Aug. 4, 2022) (granting summary judgment where speculation about employer's conduct did not establish discriminatory or retaliatory motive).

Rivera's claims for discrimination based on lack of overtime similarly fail. While losing overtime opportunities can be an adverse employment action for Title VII purposes, *Lewis v. City of Chicago*, 496 F.3d 645, 654 (7th Cir. 2007), there is simply no evidence that Rivera missed out on any overtime opportunity here. Rivera alleges U.S. Steel denied him overtime opportunities that Caucasian employees with less seniority received. [DE 1 at 3.] But U.S. Steel has established that overtime from MTEs is subject to overtime equalization under the BLA, not seniority. [DE 80 at ¶ 21.] Rivera has not put forth any admissible evidence showing that U.S. Steel treated individuals outside

21

his race or national origin more favorably when it comes to offering overtime opportunities. Rivera points to a text message with Wes Burmeister denying him overtime once, and a recording with Burmeister informing him it was not a contract week and MTEs were limited to 40 hours. [DE 80 ¶ 68.] That's it. Rivera has not identified any specific overtime opportunity denied to him much less overtime that was denied to him but provided to a similarly situated employee outside of his protected class. In other words, he has not identified a day that he was available and entitled to overtime, but it was instead provided to a Caucasian coworker, or the circumstances leading to the coworker being assigned overtime, or the decisionmaker on the assignment.

While Rivera generally argues he was contractually eligible to work a minimum of 56 hours per week, MTEs were only guaranteed a minimum of 56 hours per week if U.S. Steel was using contract workers that week to perform MTE work. [DE 80 at ¶¶ 17-20.] He has not established whether any given week was a no contractor week, which contractually reduces the number of guaranteed hours for an MTE from 56 to 40 under the BLA. *Id.*

In sum, Rivera insists that "[e]ven if the BLA does not guarantee a particular assignment, it does not authorize discrimination" [DE 95 at 3], which is certainly true. But the stumbling block is he has put forth no evidence showing he was denied overtime opportunities because of his race, and those opportunities were provided to a similarly situated employee that was Caucasian. Summary judgment is therefore

22

appropriate on these overtime accusations. *See, e.g., Simmons v. United States Steel Corp.*, 2:17-CV-272, JEM, 2020 WL 636490, at *5 (N.D. Ind. Feb. 11, 2020) (granting summary judgment on discriminatory overtime claim involving defendant U.S. Steel because plaintiff failed to "identif[y] dates during which he was denied overtime that would have been otherwise available to him or that similarly-qualified workers of a different race were assigned that overtime in his stead."); *Conley v. Village of Bedford Park*, 215 F.3d 703, 711-12 (7th Cir. 2000) (same).

## II. Retaliation Claims

Up next is Rivera's claim that he was retaliated against. Under Title VII, it is unlawful for an employer to retaliate against an employee because he or she opposes an employment practice proscribed by Title VII or because he or she participates in an investigation or proceeding under Title VII. *See* 42 U.S.C. § 2000e-3(a); *Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 633 (7th Cir. 2022). To survive summary judgment on his claim of retaliation, Rivera must produce evidence that he engaged in statutorily protected activity, that materially adverse action was taken against him by U.S. Steel, and a causal connection between the two. *Adebe v. Health and Hosp. Corp. of Marion Cnty.*, 35 F.4th 601, 607 (7th Cir. 2022).

Circumstantial evidence may be relied on to "supply the causal link . . . from which a jury may infer intentional discrimination." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). "Relevant circumstantial evidence may include 'suspicious timing, ambiguous statements of animus, evidence other employees were

23

treated differently, or evidence the employer's proffered reason for the adverse action was pretextual.'" *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019), quoting *Greengrass*, 776 F.3d at 486. "Regardless of the type of evidence presented, [t]he key question is whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action.'" *Gnutek v. Illinois Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023), quoting *Rozumalski,* 937 F.3d at 919.

The first alleged act of retaliation is the decision to move Rivera to the Coilers area of the mill. But that was consistent with the collective bargaining agreement, and Rivera received the same rate of pay as other MTE's in the Hot Strip Mill. [DE 80 at ¶¶ 17-18.] In other words, it was in essence a lateral move that can't be considered an adverse action. *See EEOC v. AutoZone, Inc.*, 860 F.3d 564, 569-70 (7th Cir. 2017) (affirming grant of summary judgment were plaintiff failed to show an adverse employment action when his employer laterally transferred him to a different store without any tangible changes to the terms and conditions of his employment). Even more telling is the fact that even Rivera doesn't think this was an adverse employment action; he admitted at his deposition that he actually liked working with the Coilers [DE 80-1 at 205] and he has presented no evidence whatsoever to show that this reassignment to the Coilers in October 2020 was an act of retaliation.

The other act of retaliation that Rivera points to is the alleged loss of overtime. This would be a material adverse employment action for retaliation purposes but as

24

explained above, Rivera has no evidence that he was actually denied overtime opportunities, and even if he did, there is no evidence of a causal connection between that and his civil rights complaint.

Moreover, a prima facie case for retaliation requires evidence showing U.S. Steel treated a similarly situated coworker who did not file a civil rights complaint more favorably, and Rivera has not provided the Court with this evidence. *See, e.g., Locke v. Chicago Family Health Cent.*, 2026 WL 622655, at *5 (N.D. Ill. Mar. 5, 2026) (granting summary judgment where plaintiff did not submit evidence of a similarly situated coworkers outside his protected class being treated more favorably). Although Rivera argues "[c]ausation may be inferred from the sequence and context of events" [DE 95 at 6], the Seventh Circuit is clear that "[a] causal link requires more than the mere fact that an employer's action happens after an employee's protected activity." *Jones v. Zimmer*, No. 3:24-cv-255 DRL, 2025 WL 3706377, at *8 (N.D. Ind. Dec. 19, 2025) (quoting *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016)). In other words, just because something occurs after the fact does not mean it occurred because of the fact. Rivera needs more than the general timing of the events to survive summary judgment. *See Bilow v. Much Shelist Freed Denenberg Ament & Rubsenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) (holding plaintiff "needs more than a coincidence of timing to create a reasonable inference of retaliation.").

III.    **Hostile Work Environment Claim**

25

The final claim is that Rivera was allegedly subjected to a hostile work environment.[2]  To establish a hostile work environment, the plaintiff must offer evidence that: (1) the work environment was both subjectively and objectively offensive; (2) his race was the cause of the harassment; (3) the conduct he was subjected to was severe or pervasive; and (4) there is a basis for employer liability.  *Milligan v. Bd. of Trustees of S. Ill. Univ.*, 686 F.3d 378, 383 (7th Cir. 2012); *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2019).  While the employee doesn't need to show that the complained of conduct was explicitly racial, the plaintiff must show it had a racial character or purpose.  *See Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544-45 (7th Cir. 2011) (affirming dismissal of hostile work environment claim where there was no allegation of "racial slurs, epithets, or other overtly race-related behavior").

Whether a behavior is severe or pervasive enough to create a hostile work environment depends on "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *EEOC v. Costco Wholesale Corp.*, 903 F.3d 618, 625 (7th Cir. 2018) (citations omitted).

---

[2] The Seventh Circuit has noted the broad nature of an adverse employment action under section 1981 can include a hostile work environment.  *See Porter v. City of Chicago*, 700 F.3d 944, 954 (7th Cir. 2012).

26

In a nutshell, Rivera has failed to produce evidence to show the conduct complained of is objectively offensive nor has he shown that it was severe or pervasive. Rivera cites to the following comments: 1) sometime in February 2020, Rivera overheard someone in a nearby room say that U.S. Steel should hire Mexicans if it wanted cheap labor [DE 80-1 at 117-21]; 2) Jim Newton, an in-house contractor, referred to Rivera as "Roberto" one time in February 2020, but Rivera never reported this to U.S. Steel [*Id.* at 118-119,121-23]; and 3) Mr. Newton allegedly said "ariba, ariba" to Rivera in February 2020, but Rivera never brought it to U.S. Steel's attention or included it in a Civil Rights Complaint with his Union. [*Id.* at 118-20.]  Of course, none of these statements are particularly laudable; far from it.  But whether they rise to the level of a hostile work environment that is severe or pervasive is a different question.

At the outset, I note that Rivera discusses these incidents in his deposition, but the complete context is still difficult for me to completely understand.  For example, Rivera testified that he recognized Bob Rogers' voice who said in February 2020 that U.S. Steel should hire Mexicans if they wanted cheap labor, but he also explained that he was on his way to talk to Julian Lopez at the time, but "Gene, Bob and Julian" were in a room and in the back room there was "Rob [and] Bud," and he overheard them talking about a motor that needed to be changed, and someone said "We'll just hire the cheap labor, hire the Mexicans." [DE 80-1 at 118, 120.]  Rivera testified when he walked into the room, everyone got quiet and that was when "Newton was calling me Roberto." [*Id.* 118.]  According to Rivera, "[t]here was a picture of an el matador on his

27

wall, a guy with a bull, you know, Spaniard thing.  And then, you know, he's funny going ariba, ariba.  They were all laughing." [*Id.* at 118-19.]  Rivera testified that he wasn't trying to "make any kind of waves so [he] just walked out." [*Id.* at 119.]  When asked what Newton's tone was when he called Rivera "Roberto," Rivera simply answered "Hey, Roberto." [*Id.* at 122.]

As I noted above, while these comments do carry a racial overtone, and can definitely be characterized as insensitive, distasteful, and inappropriate, I cannot say that they constitute severe or pervasive harassment.  As established by case law, there is "no magic number of slurs" needed to show a hostile work environment, and "an unambiguously racial epithet falls on the 'more severe' end of the spectrum."  *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002).  Even if one considered these statements as racial epithets (and I don't think they rise to that level), but even if they do, Rivera believes Bob Rogers said the first statement in a separate room (that U.S. Steel should hire Mexicans if they want cheap labor), and the statement was not made directly to Rivera, which tempers the discriminatory impact somewhat.  *See Smith v. Northeastern Illinois Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) (quotations omitted) ("While certainly relevant to the determination of a hostile work environment claim, when harassment is directed at someone other than the plaintiff, the impact of such second-hand harassment is obviously not as great as the impact of harassment directed at the plaintiff.").

The other two comments ("Roberto" and "ariba, ariba") were made by a contractor named Newton. "[A] supervisor's use of the term impacts the work environment far more severely than use by co-equals." *Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993). As I understand it, Newton was not Rivera's supervisor, which lessens the impact of the comments in question. While I certainly don't condone such comments, and they could definitely be embarrassing for Rivera to endure, I don't believe a reasonable jury would find these words physically threatening, egregious, or downright humiliating. What's more, they certainly can't be viewed as pervasive since they were all uttered at the same time within seconds of one another. *See, e.g., Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2004) (holding no hostile work environment existed where "[t]he conduct in question consists of isolated events that were not physically threatening or humiliating and in some cases were not even directed at [plaintiff].").

Rivera insists that the "totality-of-the-circumstances approach" shows that he was subjected to a hostile environment. [DE 95 at 4.] The importance of considering the entire context of the workplace is underscored by the Supreme Court in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 82 (1998), where the Court emphasized that inquiry into the objective severity of harassment "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target," and recognized "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are

29

not fully captured by a simple recitation of the words used or the physical acts performed." *See also Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001) (stressing the need to consider all the circumstances). In this case, I have considered all of the admissible evidence in this matter including Rivera's claims of segregation, discrimination in training and overtime opportunities, use of the shanties, and the offensive comments. But even considering everything together, there is no basis for a jury to conclude Rivera was subjected to a hostile work environment based on his national origin and race.

As a final note, even if Rivera's allegations were sufficient to support an actionable hostile work environment claim, there is no established employer liability. An employer is liable for a hostile work environment only if it was "negligent either in discovering or remedying the harassment." *Vance v. Ball State Univ.*, 646 F.3d 461, 470 (7th Cir. 2011). Rivera concedes he did not directly report the comments to U.S. Steel, but instead his general allegations of unfair conduct were filed by the Union grievance. [DE 80 at ¶¶ 24-25, 57-58.] In response, U.S. Steel held a meeting with the Roughing Mill MTEs and the Union on July 9, 2020, wherein the parties discussed the concerns of the alleged unfair treatment, and U.S. Steel thought it had resolved the concerns. [*Id.* at ¶¶ 26-27.] Even after the meeting, Rivera did still not report these comments to U.S. Steel, so he has also failed to establish any basis for employer liability.

### Conclusion

Accordingly, Defendant U.S. Steel Corporation's Motion for Summary Judgment [DE 79] is **GRANTED**.  Summary judgment is **GRANTED** in favor of U.S. Steel Corporation.  The Clerk is instructed to **CLOSE** this case.

**SO ORDERED**.

ENTERED: July 6, 2026.

 /s/   Philip P. Simon        
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT